UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MAHALA AULT, STACIE RHEA and
DAN WALLACE,

                        Plaintiffs,

-vs-                                          Case No. 6:07-cv-1785-Orl-31KRS

WALT DISNEY WORLD CO.,

                        Defendant.
_____

## MEMORANDUM OPINION AND ORDER

On November 9, 2007, Plaintiffs brought this class action alleging that Defendant's, Walt

Disney World Company ("Disney"), policy against Segways violates Title III of the Americans

with Disabilities Act.[1]  On December 5, 2008, the named parties submitted a settlement to the

Court (Doc. 79).  On January 5, 2009, the Court conditionally certified a settlement-only class

pursuant to FED. R. CIV. P. 23(b)(2) and granted preliminary approval to the settlement subject to

objections and a fairness hearing (Doc. 83).

After receiving more than two hundred pages of written objections from nearly one

hundred individual objectors and disability-rights advocacy groups,[2] the briefs of *amici curiae* the

_____

[1] *See generally* 42 U.S.C. §§ 12181 to 12189 (the "ADA").  Specifically, Plaintiffs alleged that
Defendant's policy violates 42 U.S.C. § 12182(b)(2)(A)(ii), as discussed in further detail, *infra*.

[2] Notwithstanding the fact that Rule 23(b)(2) classes are not entitled to notice, the Court
ordered the parties to provide the best notice practicable to the class to ensure that absent class
members had a full and fair opportunity to raise their objections (*see* Doc. 83 at 12-14; *see also* Doc.
143 at 3 (ordering that second notice be sent to class)).  The Court also extended the deadline for
submitting written objections (Doc. 137) and re-scheduled the fairness hearing originally set for March

U.S. Department of Justice and the Attorneys General of twenty-three States (the "*amici*"), and the named parties' responses thereto, the Court conducted an extensive two-day fairness hearing beginning on June 3, 2009 (Docs. 208 and 209).  In addition to oral argument, evidence presented at the fairness hearing consisted of more than eight hours of live testimony from fourteen witnesses, two-hundred pages of exhibits, video and photographic exhibits, and in-court demonstrations of the Segway and Disney's new electronic stand-up vehicle (*see* Docs. 205 - 209).[3]  Subsequent to the fairness hearing, the Court permitted the parties, objectors and *amici* to file post-hearing briefs (*see* Docs. 217 – 221 and 227).[4]

There are two questions now before the Court: (1) whether to grant final class certification and (2) whether to grant final approval to the parties' settlement.  However, because the Court finds that the named Plaintiffs lack standing, these questions are no longer ripe for review.  Accordingly, the Court's prior Order (Doc. 83) will be vacated and the Second Amended Complaint will be dismissed without prejudice.

---

31, 2009 to June 3, 2009 to accommodate late objectors (*see* Docs. 116 and 143).  In short, the Court has done all in its power to ensure that anyone with an interest in this action had an opportunity to be fully heard.

[3]References to the transcript of the fairness hearing are cited to herein as "(Tr. at [page number]; Doc. [208 or 209] at [page number])."  Although the transcript is separated into two volumes (volume I may be found at Doc. 208 and volume II may be found at Doc. 209), the entire transcript is consecutively paginated.

[4]To cure any perceived deficiencies in notice required by 28 U.S.C. §§ 1715(b) and (d) (requiring, *inter alia*, that notice of any proposed class action settlement under the Class Action Fairness Act be provided to certain federal and state officials at least ninety days before an order giving final approval to a proposed settlement is issued), the Court delayed issuing the instant Order until one hundred days after the last day of the fairness hearing (i.e., until September 14, 2009) (*see* Doc. 149 at 3; Tr. at 505-506; and Doc. 209 at 233-234).

**I**

The named Plaintiffs are all disabled individuals within the meaning of the ADA. Each Plaintiff uses, albeit to varying degrees, a Segway for his or her mobility rather than a "traditional" mobility device such as a wheelchair or scooter. When the named Plaintiffs were not allowed to use their Segways at Disney's U.S.-based theme parks (the "Parks" or "Disney's Parks"), they brought suit.

Disney's Parks attract millions of visitors each year, many of whom have significant disabilities that impair mobility. To accommodate these disabled guests, Disney has long made wheelchairs and sit-down motorized scooters available at its Parks. Due to its assessment of safety concerns, however, Disney has consistently prohibited all of its guests – regardless of disability – from using any two-wheeled vehicles in its Parks. This policy against two-wheeled vehicles applies to Segways.[5]

The Segway is a gyroscopically stabilized, two-wheeled motorized transportation device upon which an individual must stand in order to ride. Slight shifts in body weight control the movement of a Segway; as a rider leans forward, the device's computer instructs the wheels to move ahead and, as a rider leans backward, the wheels go in reverse. First unveiled in December 2001, the Segway is truly a marvel of modern technology which, although neither tested nor approved by the FDA as a medical device, has become an increasingly popular and important device for people with wide-ranging types of disabilities and mobility impairments.

_____

[5]Some Disney employees, however, may use Segways in the Parks to carry out their work. Disney also offers a tour that allows guests to visit certain portions of Epcot while riding on Disney-owned, specially programmed Segways.

Indeed, Plaintiffs allege that as many as 7,000 disabled individuals rely on Segways for their everyday mobility (Doc. 49, ¶ 13), and according to at least one Segway dealership, nearly one-third of all its sales are to mobility-disabled individuals.  *See* Robert L. Burgdorf, Jr., *Restoring the ADA and Beyond: Disability in the 21st Century*, 13 TEX. J. ON C.L. & C.R. 241, 336 (2008) (citation omitted).  With appropriate permitting, disabled individuals are now able to use Segways on the District of Columbia's Metro System, San Francisco's Bay Area Rapid Transit System, and other public transportation systems.[6]

Recognizing the preference of some of its disabled guests to stand rather than to sit, Disney recently created its own innovative device: an electronic stand-up vehicle ("ESV").[7]  Like a Segway, an individual using Disney's ESV must stand in order to use the device.  Unlike a Segway, however, Disney's ESV is stabilized by a traditional, four-wheeled scooter chassis and is operated not by shifts in body weight, but by a basic hand-controlled throttle and steering tiller.  Although Disney has reviewed its policy against Segways annually, it has consistently concluded that Segway use may not be safe in its densely crowded Parks.  For that reason, Disney's ESV was

---

[6]At least one federal court has also found that, under Title III of the ADA, a private entity cannot require a disabled individual to indemnify it for damages before allowing the individual to use a Segway at its place of public accommodation.  *See McElroy v. Simon Property Group, Inc.*, Case No. 08-CV-4041, 2008 WL 4277716, at *7 (D. Kan. Sept. 15, 2008).  *McElroy* did not address, however, whether the ADA *requires* a place of public accommodation to allow the use of Segways.

[7]Disney began developing the ESV prior to proposing the settlement (*see* Doc. 72-4, ¶ 6).  It is unclear, however, whether this suit was a catalyst for Disney's development of the ESV.

built around essentially the same technology as its proprietary sit-down scooters and underwent similar safety testing.[8]

After vigorous litigation, Disney and the named Plaintiffs ultimately agreed to settle. Under the proposed settlement agreement, Disney's policy against Segways would remain in place. However, Disney would be required to make a certain number of its ESVs available to disabled guests at its Parks.[9]

## II

### A.  The Class

The Court conditionally certified a Rule 23(b)(2) settlement-only class comprised of:

Those individuals who: (1) suffer from a mobility disability; (2) who rely upon a Segway or substantially similar stand-up mobility device for assistance with their mobility; and (3) who intend to visit the Walt Disney World Resort or the Disneyland Resort.

(*see* Doc. 81-2, ¶ 49).[10]

---

[8]Specifically, Disney subjected its ESV to the safety standards for power scooters established by the Rehabilitation Engineering and Assistive Technology Society of North America.

[9]The settlement would also require the named Plaintiffs and absent class members to release, *inter alia*, all present and future claims under federal and state law for injunctive relief arising out of Disney's policy against Segways in any of its resorts, hotels, or theme parks throughout the United States.

[10]The parties originally sought to certify a settlement-only class consisting of "All persons who: (1) claim to have a mobility impairment or disability; (2) who have brought, intend to bring or may in the future bring a Segway or other two-wheeled vehicle into the Walt Disney World Resort or the Disneyland Resort" (Doc. 77-2, ¶ 49).  Because this definition was not clearly tethered to the substantive provisions of the ADA, the Court proposed – and the parties agreed – that the definition, *supra*, was more appropriate (*see* Order at Doc. 80).

**B. Named Plaintiffs**

**Mahala Ault**

Mrs. Ault suffers from progressive Multiple Sclerosis ("MS"), a disease of the central nervous system that often produces varied and unpredictable symptoms. In her case, MS has increasingly limited Mrs. Ault's ability to walk. As a result, she sometimes uses a Segway as her mobility device.[11] Mrs. Ault's husband has sworn that his "wife's legs get very stiff and it is difficult for her to even stand without needing to hold on to something" (Doc. 68-2, ¶ 5), but that using a Segway has given her a "sense of capability she would not have in a wheelchair or scooter" and has kept her from "becoming depressed about her disease" (Doc. 68-2, ¶13). However, Mrs. Ault testified during her deposition that she was physically able to use a sit-down scooter and, in fact, had used such a scooter during a multi-day visit to four of Disney's Orlando-based Parks in December 2007 (Doc. 72-7 at 23-27).[12]

---

[11]During the fairness hearing, Mrs. Ault testified, telephonically, that she uses her Segway "Maybe once a month. It just depends if we go on a long journey. That's where I usually take it, if I go on a long journey" (Tr. at 456; Doc. 209 at 185). However, she also uses a cane and owns a scooter (Tr. at 456; Doc. 209 at 185).

[12]In an unauthenticated letter written approximately seven months after her trip to Walt Disney World, Mrs. Ault's doctor, Susan K. Mantell, opined that Mrs. Ault's Segway "provides necessary assistance in mobility while preserving her current balance and muscular strength. While a wheelchair would provide some mobility, it would lead to a decline in her strength and balance" (Doc. 206-6 at 1). Dr. Mantell's statement regarding the necessity of Mrs. Ault's Segway, however, was seriously undermined by Mrs. Ault's testimony – given more than a year after Dr. Mantell's statement – that she now uses her Segway maybe once a month.

**Stacie Rhea**

Mrs. Rhea suffers from Amyotrophic Lateral Sclerosis ("ALS"),[13] a progressive and fatal disease that affects the nerve cells in the central nervous system that control voluntary muscle movement. Because of her ALS, Mrs. Rhea is physically able to walk only short distances without tiring. She uses a Segway as her primary mobility device. Because Mrs. Rhea uses a Segway, as opposed to a wheelchair or scooter, her young children do not realize that she suffers from a serious disease. During her trip to Walt Disney World in September 2007, Mrs. Rhea testified that, though tiring, she was able to walk the first two days of the trip; on the third day, she rented a scooter for a couple of hours (Doc. 72-8 at 19-25). The prospect of having to use a scooter, however, was very upsetting to Mrs. Rhea because she was comfortable with her Segway, which, unlike a scooter, her "children didn't question" (Doc. 72-8 at 80).

**Dan Wallace**

Mr. Wallace is a partial amputee who lost part of his left foot after being struck by a train. While a prosthetic permits Mr. Wallace to walk short distances, it is painful for him to walk long distances or to remain on his feet all day. He uses a Segway for his longer-distance mobility needs. Mr. Wallace is physically able to use a wheelchair or scooter; however, as he testified at the fairness hearing, he prefers his Segway because no one looks at him and wonders what is "wrong" with him (Tr. at 23; Doc. 208 at 23).

---

[13]ALS is also known as Lou Gehrig's Disease.

### C. Objectors[14]

### Major Daniel Gade

A decorated veteran, Major Gade is a hip-level amputee who lost his right leg while serving in Iraq.  After enlisting at seventeen and graduating from West Point, Major Gade led a tank company in Korea and then in Iraq, where he was nearly killed by the roadside bomb that destroyed his leg.  While Major Gade uses a prosthetic, his ability to walk long distances is limited.  Initially he relied on wheelchairs for his mobility but quickly began to look for an alternative that, in his perspective, would restore his dignity (Tr. at 194-95; Doc. 208 at 194-95).  In this regard, Major Gade testified:

> [W]hen I was in a wheelchair, when I was a wheelchair user, when I would go into a public place, I was – I was viewed and I could hear – often hear small children and sometimes adults, who should know better, openly feeling sorry for me, saying, "Oh, look at that poor guy," and that is – more so than an amputation that causes you to limp, that is a disabling feeling.

(Tr. at 195-96; Doc. 208 at 195-96).

Major Gade eventually discovered the Segway in the summer of 2005 and has used it ever since for most of his mobility needs.[15]  Within "minutes" of first using a Segway, it became "clear . . . that a [Segway] was going to be my mobility solution because it was literally like gliding, like a magic carpet" (Tr. at 202; Doc. 208 at 202).

---

[14]Although more than one hundred individuals filed written objections, nine objectors testified at the fairness hearing.  Because these nine individuals made the same or similar objections as others who did not testify, the Court has limited its discussion of the objectors to a cross-section of the testimony given by certain objectors at the fairness hearing.

[15]Major Gade still owns and can use a wheelchair (Tr. at 202; Doc. 208 at 202).

Indeed, Major Gade has used his Segway in the White House while working as an associate director of the White House's Domestic Policy Counsel; at the Pentagon; in the halls of Congress and on the floor of the U.S. House of Representatives; on the District of Columbia's Metro System; on the streets of downtown District of Columbia after a Fourth of July fireworks display; in his home; around his one-year-old son and seven-year-old daughter; and even while walking his dog (Tr. at 192-241; Doc. 208 at 192-241).

Beyond simply improving his mobility, the Segway has changed the way people relate to Major Gade. In one telling incident, Major Gade testified that when he was riding to work one day,

> [T]his girl behind me was part of a school group of 13-year-old girls, you know, and she said to her friend, she said, "That man is the laziest man I've ever seen in my whole life," and she was ten feet behind me.
>
> So I literally just put my hand in my pocket and raised my pants leg just a little bit until she could see [the] metal [of my prosthetic], and I heard her go (gasp), and this girl – that's the difference between when you're riding a Segway and when you look like I do, and I'm not obviously disabled when I'm fully clothed. The difference for me was people . . never thought I was disabled.
>
> So the benefit of that was that I was able to then relate to them on the basis of my mind and on the basis of my – you know, who I am and not as – you know, not put in the disability box that people unfortunately have, the stigma of "Oh, this disabled person might be sensitive about being disabled."

(Tr. at 202-03; Doc. 208 at 202-03).

Like the named Plaintiffs, Major Gade was denied the use of his Segway at Disney World in December 2006 (Tr. at 210-11; Doc. 208 at 210-11). Although he could have used a wheelchair or scooter, he choose not to go to the Park and went scuba diving instead (Tr. at 212; Doc. 208 at 212).

When asked whether he would be comfortable using an ESV at Disney World, Major Gade testified: "I would be physically comfortable and psychologically miserable and, as a result, would go scuba diving again" (Tr. at 241; Doc. 208 at 241).

**Noel Lee**

After being exposed to radiation approximately thirty years ago while working at the Lawrence Livermore National Laboratory, Mr. Lee suffers from a neurological disorder that has caused the nerves in his spine to gradually deteriorate, resulting in a complete loss of mobility below his calves (Tr. at 242; Doc. 208 at 242). Although he cannot walk, Mr. Lee can still stand. For Mr. Lee, the Segway was the perfect mobility device; without it, he – like Major Gade – felt as though he had lost his dignity (Tr. at 244; Doc. 208 at 244).

While visiting a Disney hotel in California with his daughter, Mr. Lee was prohibited from using his Segway. Instead, he was offered a wheelchair or scooter. Although Mr. Lee is able to use a wheelchair and owns a scooter-like device, he strongly prefers his Segway.

**McKenzie Kilgore**

Ms. Kilgore is a fourteen-year-old who was born with cerebral palsy (Tr. at 390; Doc. 209 at 119). A remarkable young woman, she has overcome the challenges of her condition and maintained her independence by using a Segway. Although she can use a wheelchair, when asked how it felt to be pushed around in one, Ms. Kilgore testified:

> I hated it so much. It made me feel like more disabled than I already am; and people were – like, they constantly wonder why, like, I was in a wheelchair; and it also greatly affected my social life because, like, my friends would ditch me because it was too slow for them; and yeah, it really took an emotional impact on me.

(Tr. at 391; Doc. 209 at 120).

When Ms. Kilgore starts high school next year, she will be using her Segway to navigate between classes and to keep up with her peers (Tr. at 391; Doc. 209 at 120).

### III

At the very outset of this case, Disney filed a motion to dismiss based on Plaintiffs' lack of ordinary Article III standing (Doc. 20 at 3).  The Court agreed with Disney, finding that Plaintiffs had failed to allege a specific intent to visit or return to Disney World, and dismissed Plaintiffs' Complaint without prejudice (Doc. 21).

Upon the filing of the Amended Complaint, Disney filed a subsequent motion to dismiss in which it renewed its standing argument and also argued that Plaintiffs had failed to allege that the requested change in Disney's policy against Segways was "necessary" to afford them access to the Parks (Doc. 50 at 6) (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001) and 42 U.S.C. § 12182(b)(2)(A)(ii)).

The Court denied Disney's subsequent motion to dismiss (Doc. 52).  Because the Amended Complaint clearly alleged an intent to visit the Parks at a specific point in time in the near future, the Court found that Plaintiffs had alleged a concrete and particularized injury that was traceable to Disney's conduct and that could likely be addressed by favorable injunctive relief.  With respect to Disney's contention that Plaintiffs had failed to allege that a policy modification was "necessary," the Court concluded that this argument "would require the exploration and resolution of factual issues that are simply not before the Court at this time" (Doc. 52 at 4).

On the record as it stands now, however, it is clear that the named Plaintiffs' requested relief is not "necessary" and, therefore, the named Plaintiffs' claims fall outside the zone of interests created by 42 U.S.C. § 12182(b)(2)(A)(ii).  Although the parties did not address this

prudential limitation in their initial arguments over ordinary Article III standing, for the reasons

discussed, *infra*, the Court is compelled to conclude that it was without jurisdiction to initially

certify a class or give preliminary approval to the parties' settlement.[16]

### A

As the Supreme Court has often stated, standing "involves both constitutional limitations

on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S.

490, 498 (1975) (citations omitted). Apart, then, from the requirement that there be "a logical

nexus between the status asserted and the claim sought to be adjudicated," *Flast v. Cohen*, 392

U.S. 83, 102 (1968), prudential limitations are judicially self-imposed limits on the exercise of

federal jurisdiction that are "founded in the concern about the proper – and properly limited – role

of the courts in a democratic society." *Id.* at 498; *see also Allen v. Wright*, 468 U.S. 737, 751

(1984). They relate to an idea, "which is more than an intuition but less than a rigorous and

explicit theory, about the constitutional and prudential limits to the powers of an unelected,

unrepresentative judiciary in our kind of government." *Allen*, 468 U.S. at 750 (1984) (quotation

omitted).

Numbered among these prudential limitations is the requirement that a plaintiff's grievance

must arguably fall "within the zone of interests protected or regulated by the statutory provision or

constitutional guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997)

---

[16]Inasmuch as the named Plaintiffs' standing is a prerequisite to jurisdiction that is antecedent to the propriety of class certification, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) is inapposite. *See*, *e.g.*, *Lewis v. Casey*, 518 U.S. 343 (1996); *Simon v. E. Ky. Welfare Rights Orgs.*, 426 U.S. 26 (1976); *see also* Rules Enabling Act, 28 U.S.C. § 2072(b) (federal rules of procedure shall not "enlarge or modify any substantive right").

(citations omitted).   Whether the interest sought to be protected by the complainant is within the zone of interests to be protected by the statute varies according to the provisions of law at issue. *Id*.  While the test is not "especially demanding," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987), it must turn   on the specific statutory provision that serves "as the gravamen of the complaint" – not on the overall purpose of the statutory act in question.  *Bennett*, 520 U.S. at 175-76 (citations omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 88 3 (1990); *Assoc. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 155-56 (1970); *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 813-14 (D.C.Cir. 1987) ("in applying the zone [of interest] test a court must discern whether the interest asserted by a party *in the particular instance* is one intended by Congress to be protected   . . . by *the statute under which suit is brought*") (quotation and citation omitted).

**B**

The citizen-suit provision of Title III of the ADA states:

The remedies and procedures set forth in section 2000a-3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter . . . .

42 U.S.C. § 12188(a)(1).

Section 2000a-3(a), in turn, provides that:

Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by [this title], a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved and, upon timely application, the court may, in its discretion, permit the Attorney General to intervene in such civil action if he certifies that the case is of general public importance . . . .

-13-

42 U.S.C. § 2000a-3.

On its face, Title III's citizen-suit provision authorizes private suits, subject to the possible intervention of the Attorney General, for injunctive relief only that are brought by individuals who are being (or are about to be) subjected to "discrimination."  In comparison to other citizen-suit provisions, Title III of the ADA is arguably limited.  *See*, *e.g.*, *Bennett*, 520 U.S. at 164-65 (comparing various statutory formulations of certain citizen-suit provisions and characterizing, for example, a provision with the language, "any person injured in his business or property," as restrictive).  Indeed, notwithstanding the fact that injunctive relief – the only relief available under the ADA to private citizens absent intervention by the Attorney General – must be specific and narrowly tailored, *see*, *e.g.*, FED. R. CIV. P. 65(d), an individual's interests against "discrimination" are not writ large.  As a threshold matter, one must assert that the discrimination at issue is specifically prohibited by the ADA.

Thus, while Title III of the ADA generally provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods [and] services . . . of any place of public accommodation," 42 U.S.C. § 12182(a), to actually be "discriminated against," an individual must allege that the discrimination comes within the ambit of at least one of the five specific prohibitions contained in 42 U.S.C. § 12182(b)(2).[17]

---

[17]Section 12182(b)(1) also contains "general" – rather than "specific" – types of discrimination.  Section 12182(b)(1), however, has never been at issue in this case.

In this case, the named Plaintiffs have relied exclusively on only one of the five specific

prohibitions: Section 12182(b)(2)(A)(ii),[18] which defines "discrimination" as

> (ii) a failure to make reasonable modifications in policies, practices, or procedures,
> when such modifications are necessary to afford such goods, services, facilities,
> privileges, advantages, or accommodations to individuals with disabilities, unless
> the entity can demonstrate that making such modifications would fundamentally
> alter the nature of such goods, services, facilities, privileges, advantages, or
> accommodations . . . .

42 U.S.C. § 12182(b)(2)(A)(ii).

By its plain language, Section 12182(b)(2)(A)(ii) protects only those interests that arguably

arise from a public accommodation's failure to make reasonable modifications that are "necessary"

for a disabled individual to be afforded goods or services.  The word "necessary" means

"indispensable; vital, essential; requisite."  OXFORD ENGLISH DICTIONARY (2d ed. 1989), *available

by subscription at* http://dictionary.oed.com/; *see also* 1WEBSTER'S THIRD NEW INTERNATIONAL

DICTIONARY 1510 (1961) (defining "necessary" to mean "unavoidable; inevitable . . ."); 

1AMERICAN HERITAGE DICTIONARY 834 (2d. College ed. 1982) (defining "necessary" to mean

"absolutely essential; indispensable").  Thus, a claim is not within the zone of interests that

---

[18](*see* Doc. 1, ¶ 3 (Complaint); Doc. 49, ¶ 3 (Amended Complaint); and Doc. 81-2. ¶ 3 (Second
Amended Complaint)).  Plaintiffs also cite to 28 C.F.R. § 36.202, an ADA regulation promulgated by
the Justice Department concerning participation in unequal benefits.  Neither Plaintiffs, Disney,
objectors, nor *amici* have ever developed a case for relying on this regulatory provision.  Even
assuming, *arguendo*, however, that they had, the interests that Plaintiffs seek to vindicate in this case
still fall outside this provision's zone of protected interests.  In pertinent part, regulation 36.202
provides: "A public accommodation shall not afford an individual or class of individuals, on the basis
of a disability or disabilities of such individual . . ., with the opportunity to participate in or benefit
from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded
to other individuals."  28 C.F.R. § 36.202(b); *Cf.* 42 U.S.C. § 12182(b)(1)(A)(ii) (also prohibiting
participation in unequal benefits).  As discussed further, *infra*, the named Plaintiffs' case has little to
do with unequal benefits or necessary policy modifications.

Congress sought to protect in Section 12182(b)(2)(A)(ii) unless the discrimination at issue

involves a modification that is at least arguably indispensable or essential to afford access.[19]

## C

It is beyond peradventure that Title III of the ADA requires places of public

accommodation to allow mobility-disabled individuals to use certain mobility devices.  The more

difficult question, of course, is *which* devices must be allowed.  Although the ADA has historically

been applied, in significant part, to increase wheelchair accessibility, nothing in the ADA's text

limits the disabled to that or any other particular mobility device.  As better devices emerge, many

individuals who were formerly confined to wheelchairs, or restricted by other devices, will have

increasingly better options.  The Court's power to recognize new devices under the ADA,

however, is not without limit and must comport with the statutory and regulatory framework that is

established and amended by Congress and appropriate federal agencies.

All of the named Plaintiffs and objectors who testified in this case are able to use

wheelchairs or scooters.  Although some individuals may, with good reason, not want to use those

devices and instead prefer to use a Segway, that preference  – standing alone – is not essential to

accessing Disney's Parks.  Although there may be some disabled individuals for whom an upright

mobility device such a Segway – and not a wheelchair or some other "traditional" device  –

amounts to something that is essential, it remains a near physiological certainty that most people,

regardless of disability, can sit from time to time.  The named Plaintiffs and objectors who flew or

drove to Orlando for the fairness hearing, or who actually visited Disney World while seated in a

---

[19]A party must also show, of course, that the requested modification is "reasonable."

wheelchair or scooter, are no different from most of humanity in this regard. With respect to the named Plaintiffs, in particular, there is simply no evidence that their use of a Segway is arguably essential to accessing Disney's Parks. Thus, on the record before it, the Court concludes that the named Plaintiffs' claims fall outside the zone of interests protected by Section 12182(b)(2)(A)(ii).

## D

Human beings are not defined by physiology alone. As the fairness hearing ultimately made clear to the Court, this case is not about necessary accommodation. The real question, it seems, is the extent to which the ADA can (or should) promote equal treatment and human dignity by requiring acceptance of new technologies. As Major Gade and others testified, the Segway is quickly changing the way disabled Americans are perceived and treated in our society. The importance of this interest simply cannot be overlooked. While on the facts of this case equal treatment and human dignity may not be protected under Section 12182(b)(2)(A)(ii), those interests may still be protected by other provisions of the ADA or state law.

As the Supreme Court has recognized, the purpose of the ADA is to eliminate the "physical *and social* structures" that have impeded the disabled. *Tennessee v. Lane*, 541 U.S. 509, 535-36 (2004) (Ginsburg, J., Souter, J., and Breyer, J., concurring) (holding that Congress had abrogated the States' sovereign immunity under Title II of the ADA for the purpose of ensuring equal access to courts) (emphasis added). In this regard, the ADA concerned itself with much more than just eliminating physical barriers to access, but with advancing the "stature" of persons with disabilities, protecting against the "stigma" that is often associated with being disabled and

promoting respect for "the dignity of individuals with disabilities." *Id.* at 536-37 (citations omitted).[20]

Whether another provision of the ADA or state law can provide the relief that the named Plaintiffs seek is unclear. Apart from the courts, it may be the case that another branch has the initial responsibility to ensure that individuals with disabilities can take advantage of Segways to serve the broader goals of Title III. As to these named Plaintiffs, however, these are questions best left for another day.

## IV

For the foregoing reasons, it is **ORDERED** that the Court's prior Order (Doc. 83), conditionally certifying this case as a class action and giving preliminary approval to the parties' settlement agreement, is hereby **VACATED**. It is **FURTHER ORDERED** that Plaintiffs' Second Amended Complaint (Doc. 81-2) is **DISMISSED** without prejudice.

The Clerk of the Court is directed to terminate all pending motions.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 6, 2009.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

---

[20]*See*, *e.g.*, 42 U.S.C. § 12182(b)(2)(A)(iii) (making "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or *otherwise treated differently* than other individuals because of the absence of auxiliary aids and services," actionable discrimination under Title III of the ADA) (emphasis added).